UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANIEL GREGORIE, in his
individual capacity and as
Successor In Interest to
Jessica Gregorie, deceased,
and MARGARET GREGORIE, in
her individual capacity and
as Successor In Interest to
Jessica Gregorie, deceased,

                                  NO. CIV. S-08-259 LKK/DAD

       Plaintiffs,

    v.

                                  O R D E R

ALPINE MEADOWS SKI CORPORATION,
a California Corporation and
POWDER CORP., a Delaware
Corporation,

       Defendants.

_____/

    Plaintiffs are the parents and successors in interest of a

woman who died while snowboarding at defendant Alpine Meadows Ski

Corporation's ("Alpine Meadows") ski resort. They have brought

wrongful death and survivorship actions alleging premises

liability, misrepresentation of risk, negligence, breach of

contract and recision of contract, seeking declaratory judgment and

1

1   damages.

2       In the instant motion, defendants Alpine Meadows and its

3   parent corporation, defendant Powdr Corporation, have moved for

4   summary judgment on all of plaintiffs' causes of action. The court

5   resolves the motion on the papers and after oral argument.

**I. BACKGROUND AND FACTS[1]**

7   **A.   Facts**

8       Plaintiffs have brought this case alleging defendants'

9   unlawful acts which they allege resulted in the death of their

10  daughter, Jessica Gregorie. The decedent was a twenty-four year

11  old, experienced snowboarder at the time of her death. On December

12  4, 2005, she had purchased a season pass to the Ski Area. In

13  conjunction with that, she signed a waiver. In pertinent part, it

14  provided,

> I agree to be bound by the following Conditions of
> Issuance, which includes but are not limited to: . . .
> I WILL always observe and obey posted signs. I will keep
> out of all areas marked "Close Area" and "Closed Area -
> Avalanche Danger." If I ski or snowboard beyond the ski
> area boundary, I agree to assume all risks inherent in
> backcountry skiing and snowboarding. . . .
> RELEASE FROM LIABILITY AND INDEMNITY AGREEMENT
> I understand that the sport of skiing and snowboarding
> can be dangerous and involve the risk of injury and
> death. Despite the risk involved in the sports and as
> consideration for being allowed to participate in the
> sport(s), I AGREE TO EXPRESSLY ASSUME ANY AND ALL RISK
> OF INJURY OR DEATH which might be associated with my
> participation in the sport of skiing and snowboarding

---

[1]All facts are undisputed unless otherwise noted.
    Each party has objected to several items of the other's
evidence or moved to strike that evidence. Many of these relate to
evidence not relied on by the court in ruling on the instant
motion. To the extent that the evidence is relied on, the
objections are OVERRULED and the motions to strike are DENIED.

and use of the facilities of Alpine Meadows, including . . . skiing or snowboarding beyond the ski area boundary . . . . I AGREE NEVER TO SUE AND TO RELEASE FROM LIABILITY Alpine Meadows Ski Corporation, Powdr Corp. . . . and their owners, employees, agents, landowners and affiliated companies (hereinafter collectively referred to as "Alpine Meadows") for any damage, injury or death to me arising from my participation in the sports of skiing and snowboarding and my use of the facilities at Alpine Meadows regardless of cause, including the alleged negligence of Alpine Meadows. I understand that this is a RELEASE OF LIABILITY which will prevent me or my heirs from filing suit or making any claim for damages in the event of injury or death to me. . . . With the aforesaid fully understood, I nevertheless enter into this agreement freely and voluntarily and agree that it is binding upon me, my child, the user, my heirs, assigns, and legal representatives. I understand and agree that this agreement is valid forever and will be interpreted under California law . . . . THIS IS A RELEASE OF LIABILITY. READ IT AND UNDERSTAND IT BEFORE SIGNING IT.

Compl. Ex. A.

On February 5, 2006, decedent went snowboarding at Alpine Meadows Ski Area with a friend, Joe Gaffney. She rode a chair lift at Summit Six at least once that morning. There were two signs posted at the base of that lift. One stated "Firm Conditions Exist. A Fall Could Result With An Uncontrollable Slide" and the other stated "THIS IS *NOT* A BEGINNER LIFT."

At approximately 11:00 AM, Gregorie and Gaffney decided to take the High Beaver Traverse to access the "Beaver Bowl" area. Gregorie had hiked the High Beaver Traverse in the past. Beaver Bowl is rated as double-black-diamond terrain, the most difficult type of terrain on the mountain.

While hiking the traverse, Gregorie took off her snowboard. She slipped due to the icy condition of the snow, fell and slid

1   over a rock outcropping. Both a witness who observed her fall and

2   Gaffney testified that it appeared that Gregorie's board slipped

3   from her grasp and when she reached for it, she lost her balance

4   and began sliding. Once Gregorie began to slide, she was unable to

5   stop due to the firm snow on the ground. As she slid, she slid past

6   a large tree that had posted on it a sign stating, "Ski Area

7   Boundary."

8        **1.   Ownership, Permitting and Conditions of the Terrain**

9        The area on which Gregorie initially fell was land owned in

10  fee simple by an Alpine Meadows affiliate.[2] There is no dispute

11  that there were between fifteen and twenty orange and black

12  boundary signs along the downhill side of the traverse including

13  the one on the tree that Gregorie slid past.

14       The parties dispute what the boundary of the Alpine Meadows'

15  ski area was and whether the boundary markers accurately reflected

16  it, so as to give notice to users of when they were out-of-bounds.

17  Defendant has tendered evidence that all areas inside the boundary

18  signs are, in fact, within the boundary of the ski resort.

19  Declaration of Jill Penwarden In Support of Def.'s Mot. for Summ.

20

21        [2]One of the maps relied on by plaintiffS and apparently
    submitted to the United States Forest Service as an amendment to
22  defendants' Special Use Permit indicates that part of this area
    (Section 7 of the ski area) was Forest Service land. See Honowitz
23  Decl. Ex. C. If the undisputed facts are to be believed, however,
    the entirety of Section 7 was owned in fee simple by private
24  parties and thus the contrary demarcation on the map is in error.
    See Pls.' Response to Defs.' Supp. Sep. Statement of Material Facts
25  No. 21; Pls.' Statement of Material Facts In Support of Opp. to
    Defs.' Mot. for Summ. J. No. 49. The court is, of course,
26  ordinarily bound to treat as undisputed facts that the parties have
    expressly provided as such.

1   J. ("Penwarden Decl.") Ex. Q (Depo. of Larry Heywood) at 59:5-25,

2   73:2-74:25. Plaintiff has tendered evidence, however, that the

3   boundary of the ski resort was unclear and not necessarily

4   reflected in the boundary markers. Instead, according to

5   plaintiffs, the boundary line was above the area that was the site

6   of plaintiff's fall, so that plaintiff's initial fall occurred when

7   she was out of bounds of the ski resort. Declaration of Billy

8   Martin In Support of Pls.' Opp. to Def.'s Mot. for Summ. J.

9   ("Martin Decl.") ¶¶ 11-13, Ex. D; Declaration of Melvin Honowitz

10  In Support of Pls.' Opp. to Def.'s Mot. for Summ. J. ("Honowitz

11  Decl.") Ex. LL (Depo. of Jason Hill) at 16:3-17, Ex. KK (Depo. of

12  Billy Martin) at 195:16-196:21.

13      DefendantS further contend that regardless of whether the High

14  Beaver Traverse was inside or outside the boundary line, defendant

15  managed and patrolled it in the same manner as was done for the

16  rest of the resort. Declaration of Jeff Goldstone in Support of

17  Def.'s Mot. for Summ. J. ("Goldstone Decl.") ¶ 7. Plaintiffs

18  dispute this characterization in a number of ways. First, they

19  assert that the traverse itself was not marked except with open or

20  closed signs at its onset and boundary signs and that its mid- and

21  low-points were not firmly established, but merely established anew

22  by the first person to use it after a storm. Horowitz Decl. Ex. EE

23  (Depo. of Scott Swietanski) at 114:1-117:13, Ex. FF (Depo. of Matt

24  Janney) at 127:6-128:8, 176:11-14. This was usually a member of the

25  ski patrol. Id. Ex. FF (Depo. of Matt Janney) at 153:8-154:8.

26  Plaintiffs have tendered evidence that the traverse is not

1 typically groomed at the location which Gregorie was using at the

2 time of her fall. Id. at 176:1-10.

3      Gaffney, Gregorie's companion, testified that he had not

4 intended to leave the boundaries of the ski resort that day.

5 Honowitz Decl. Ex. AA (Depo. of Joe Gaffney) at 84:19-24. He

6 understood that Alpine Meadows would mark the boundary so that he

7 would know if he was in-bounds or out of bounds. Id. Ex. BB. (Depo.

8 of Joe Gaffney) at 394:10-395:4. Gaffney described Gregorie as a

9 "pretty common sense oriented" snowboarder. Id. Ex. AA at 102:14-

10 21.

11      **2.    Relationship Between the Defendants**

12      Alpine Meadows is a wholly-owned subsidiary of Powdr

13 Corporation. On the date of the accident, Alpine Meadows owned and

14 operated the ski resort and employed all of the people who worked

15 there. Powdr Corp. and Alpine Meadows maintain separate offices,

16 corporate records, facilities, human resources departments,

17 accounting, and financial staff. They have separate work forces,

18 payroll records, federal tax identification numbers, assets, and

19 records relating to disbursements. They issued separate W-2 forms

20 to employees and 1099 forms to their respective independent

21 contractors, vendors and suppliers.

22      Despite this, plaintiffs have tendered some evidence of

23 Powdr's involvement in Alpine Meadows' management and operation.

24 Matt Janey, the general manager of Alpine Meadows testified that

25 for some decisions, such as the decision to close or rebuild a

26 building, he would seek approval from the Chief Financial Officers

1 of Powdr. Honowitz Decl. Ex. FF (Depo. of Matt Janey) at 28:2-
2 20:19. He would also "run it by people at Powdr" for budget
3 purposes if he sought to propose a change to the ski resort's
4 master plan to the Forest Service. Id. at 45:16-24; see also id.
5 at 67:11-69:25. Janney also stated that after he ceased working at
6 Alpine Meadows, he began to work for Powdr, which he considered "a
7 promotion." Id. at 25:15-18.

8 **B.   Procedural History**

9 Plaintiffs commenced this action on February 1, 2008. In their
10 complaint, they seek recovery on wrongful death and survivorship
11 theories. In their first and fourth causes of action they allege
12 premises liability. Their second cause of action alleges
13 misrepresentation of risk of harm relating to the traverse. Their
14 third cause of action alleges negligence. Their fifth cause of
15 action alleges breach of the season pass contract entered between
16 Gregorie and Alpine Meadows. The sixth and eighth causes of action
17 seeks rescission of that contract on the basis of fraud in the
18 inducement. The seventh cause of action seeks declaratory relief
19 regarding Gregorie's and defendant's respective rights and duties
20 under the season pass contract. In addition to declaratory relief,
21 plaintiffs seek damages, punitive damages, and costs.

22 **II. SUMMARY JUDGMENT STANDARDS UNDER FEDERAL RULE OF**
23 **CIVIL PROCEDURE 56**

24 Summary judgment is appropriate when it is demonstrated that
25 there exists no genuine issue as to any material fact, and that the
26 moving party is entitled to judgment as a matter of law.  Fed. R.

1   Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144,

2   157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir.

3   1995).

> Under summary judgment practice, the moving party
> [A]lways bears the initial responsibility of informing
> the district court of the basis for its motion, and
> identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of
> material fact.

9   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the

10  nonmoving party will bear the burden of proof at trial on a

11  dispositive issue, a summary judgment motion may properly be made

12  in reliance solely on the 'pleadings, depositions, answers to

13  interrogatories, and admissions on file.'"  Id.  Indeed, summary

14  judgment should be entered, after adequate time for discovery and

15  upon motion, against a party who fails to make a showing sufficient

16  to establish the existence of an element essential to that party's

17  case, and on which that party will bear the burden of proof at

18  trial.  See id. at 322.  "[A] complete failure of proof concerning

19  an essential element of the nonmoving party's case necessarily

20  renders all other facts immaterial."  Id.  In such a circumstance,

21  summary judgment should be granted, "so long as whatever is before

22  the district court demonstrates that the standard for entry of

23  summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

24  at 323.

25      If the moving party meets its initial responsibility, the

26  burden then shifts to the opposing party to establish that a

genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec.Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); see also In re Citric Acid Litigation, 191 F.3d 1090, 1093

9

1  (9th Cir. 1999).   The evidence of the opposing party is to be

2  believed, see Anderson, 477 U.S. at 255, and all reasonable

3  inferences that may be drawn from the facts placed before the court

4  must be drawn in favor of the opposing party, see Matsushita, 475

5  U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,

6  655 (1962) (per curiam)); see also Headwaters Forest Def. v. County

7  of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000).   Nevertheless,

8  inferences are not drawn out of the air, and it is the opposing

9  party's obligation to produce a factual predicate from which the

10 inference may be drawn.   See Richards v. Nielsen Freight Lines, 602

11 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

12 (9th Cir. 1987).

### III. ANALYSIS

14 Defendants have moved for summary judgment on all of

15 plaintiffs' causes of action and on their prayer for punitive

16 damages. As to plaintiffs' first, second, third, fourth, and

17 seventh causes of action, defendants seeks summary judgment

18 premised on their pled affirmative defenses of express assumption

19 of risk and primary assumption of risk. They also move for summary

20 judgment on plaintiffs' causes of action for rescission of contract

21 and breach of contract, asserting that plaintiffs cannot adduce

22 sufficient evidence to require trial on either claim. Finally,

23 defendants move for summary judgment on plaintiffs' prayer for

24 punitive damages and for the liability of defendant Powdr

25 Corporation.

26 The court first considers whether defendant Powdr Corporation

1  can be found liable for the acts of Alpine Meadows. Next, the court

2  addresses the defendants' primary assumption of risk defense and

3  then the issues surrounding the waiver, including whether it is

4  unenforceable due to defendants' breach or due to rescission.

5  Finally, the court addresses the issues of proof of punitive

6  damages.

7  **A.   Liability of Defendant Powdr Corporation**

8        The plaintiffs assert that Powdr may be liable for the acts

9  or omissions of Alpine because it is an alter ego to Alpine. Under

10  California law, two elements must be satisfied to invoke an alter

11  ego theory: "[f]irst, there must be such a unity of interest and

12  ownership between the corporation and its equitable owner that the

13  separate personalities of the corporation and the shareholder do

14  not in reality exist. Second, there must be an inequitable result

15  if the acts in question are treated as those of the corporation

16  alone." Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th

17  523, 538 (2000). "[B]oth of these requirements must be found to

18  exist before the corporate existence will be disregarded."

19  Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825,

20  837 (1962). The plaintiff bears the burden in presenting evidence

21  that satisfies both prongs of the test. Mid-Century Ins. Co. v.

22  Gardener, 9 Cal. App. 4th 1205, 1212 (1992).

23        The agency theory of jurisdiction over a defendant is related

24  but distinct. Under agency theory, "the question is not whether

25  there exists justification to disregard the subsidiary's corporate

26  identity, the point of the alter ego analysis, but instead whether

1  the degree of control exerted over the subsidiary by the parent is

2  enough to reasonably deem the subsidiary an agent of the parent

3  under traditional agency principles." Sonora Diamond, 83 Cal. App.

4  4th at 541. In the present case, the plaintiff argues that Powdr

5  exerted day-to-day control over Alpine sufficient to support its

6  claim that unity of interest exists (under the first prong of the

7  alter ego test). Accordingly, the court consider the alter ego and

8  agency theories simultaneously, as the latter is encompassed in the

9  first prong of the former.

10  "There is no litmus test to determine when the corporate veil

11  will be pierced." Mesler v. Bragg Mgmt. Co., 39 Cal. 3d 290, 300

12  (1985). However, the California courts have identified several

13  factors relevant to the analysis. These include the control of the

14  day-to-day operations of the subsidiary, commingling of funds,

15  shared employees, shared legal services, disregard of corporate

16  formalities, and inadequate capitalization. Associated Vendors.,

17  210 Cal. App. 2d at 837-40. Other factors include the lack of

18  segregation of corporate records and identical directors and

19  officers. Sonora, 83 Cal. App. 4th at 539.

20  As to the first factor, courts have held that one entity is

21  the alter ego of another when the parent cooperation controls all

22  aspects of a subsidiary's business, from policy-making to

23  day-to-day operations. See, e.g., Rollins Burdick Hunter of S.

24  Cal., Inc. v. Alexander & Alexander Servs., Inc., 206 Cal. App. 3d

25  1, 11 (1988). Nevertheless,

26  ////

1  a parent corporation may be directly involved in the
2  activities of its subsidiaries without incurring
   liability so long as that involvement is consistent with
3  the parent's investor status. Appropriate parental
   involvement includes: monitoring of the subsidiary's
4  performance, supervision of the subsidiary's finance and
   capital budget decisions, and articulation of general
   policies and procedures.
5

6  AT&T v. Compagnie Bruxelles Lambert, 94 F.3d 586, 591 (9th Cir.

7  1996) (internal citations omitted).

8      Here, the plaintiffs point out that Powdr reviewed and

9  approved Alpine's budget, expenses, master plan and was involved

10 in major decision making, including having the ultimate authority

11 to approve of reject the master plan. Pls.' Statement of Material

12 Facts In Support of Opp'n to Defs.' Mot. for Summ. J. ¶¶ 106-108.

13 Although these examples indicate that Powdr was entitled to make

14 significant decisions regarding spending and major development at

15 Alpine, plaintiffs have not provided any evidence of day-to-day

16 control. Instead, these actions seem more consistent with the

17 ordinary level of control a parent corporation would have over a

18 subsidiary. See AT&T, 94 F.3d at 591; Wady v. Provident Life &

19 Accident Ins. Co. of America, 216 F. Supp. 2d 1060, 1068-69 (C.D.

20 Cal. 2002) (applying California law and finding inadequate evidence

21 of a "unity of interest" between the parent and subsidiary where

22 the parent monitored subsidiary's performance, supervised the

23 subsidiary's finance and capital budget decisions, and articulated

24 general policies and procedures); see also Fletcher v. Atex, Inc.,

25 68 F.3d 1451, 1459-60 (2d Cir. 1995) (no alter ego liability where

26 parental approval was required for leases, major capital

13

1 expenditures, and the sale of its subsidiary's assets). Here,
2 plaintiff simply has not tendered sufficient evidence that Powdr's
3 control over Alpine was greater than that would typically exist in
4 a parent-subsidiary relationship. Put another way, plaintiffs have
5 failed to provide evidence sufficient to justify trial on the
6 issue.

7 Turning to the additional factors, courts have also noted the
8 significance of the existence of shared employees in imposing
9 liability through alter ego. See, e.g., Rollins, 206 Cal. App. 3d
10 at 11. This factor does not have great weight, as courts have
11 recognized that "[i]t is considered a normal attribute of ownership
12 that officers and directors of the parent serve as officers and
13 directors of the subsidiary." Sonora, 83 Cal. App. 4th at 548-49.
14 Here, the evidence is undisputed that Powdr and Alpine maintained
15 separate workforces and human resource departments. Although
16 plaintiffs purportedly dispute that Powdr did not supervise or
17 manage Alpine employees, the evidence they have tendered does not
18 support their characterization. See Honowitz Decl. Ex. FF (Janney
19 Depo. at 28:2-20:19, 45:16-24, 67:11-69:25). Instead, this
20 testimony only provides that Alpine's general manager would seek
21 approval from Powdr for certain major decisions or capital outlays,
22 which does not indicate that the two corporations shared employees.

23 Next, a lack of segregation of corporate records would weigh
24 in favor of imposing liability on Powdr under an alter ego or
25 agency theory. Sonora, 83 Cal. App. 4th at 539. Under the facts
26 tendered, this factor weighs in favor of Powdr. The undisputed

1  evidence is that Powdr and Alpine had separate payroll records, tax

2  identification numbers, and disbursement records and issued

3  separate tax forms to their employees and contractors.

4  See Pl.'s Response to Defs.' Supp. Separate Statement of Disputed

5  and Undisputed Material Facts in Support of Opp'n to Defs.' Mot.

6  for Summ. J. ¶ 65.

7      Since the plaintiff have not provided evidence relevant to

8  additional factors, see Associated Vendors., 210 Cal. App. 2d at

9  837-40 and Sonora, 83 Cal. App. 4th at 539, and because the factors

10 above favor Powdr, plaintiffs have not shown that there is adequate

11 evidence from which a factfinder could conclude that Powdr was the

12 alter ego of Alpine for the purpose of liability. Furthermore,

13 since the plaintiff has failed to demonstrate day-to-day control

14 by Powdr over Alpine, an agency theory is also not supported in

15 this case.

16     Moreover, in order to impose alter ego liability, plaintiff

17 must show that there are facts from which a factfinder could

18 conclude that injustice would result if Powdr was not a party to

19 this action. See Sonora, 83 Cal. App. 4th at 539 (quoting Lowell

20 Staats Mining co. v. Pioneer Uravan, Inc., 878 F.2d 1259, 1263

21 (10th Cir. 1989)). Here, plaintiffs have not tendered any evidence

22 purporting to demonstrate an inequitable result if the acts of the

23 cooperation are treated as Alpine's alone.

24     Accordingly, because plaintiffs have not tendered adequate

25 evidence from which alter ego or agency liability could be imposed,

26 defendant Powdr's motion for summary judgment on all causes of

1  action is granted.

2  **B.   Primary Assumption of Risk**

3      Plaintiffs' first, second, third, fourth and seventh causes

4  of action are grounded in the theory that defendants acted

5  negligently or otherwise improperly in their maintenance and

6  ownership of the areas relevant to Gregorie's death. Defendants

7  assert as an affirmative defense that the risks Gregorie

8  encountered were inherent in the sport of snowboarding and thus she

9  assumed them under the doctrine of primary assumption of risk.

10     In <u>Knight v. Jewett</u>, 3 Cal. 4th 296, 315 (1992), the

11  California Supreme Court described the principles of assumption of

12  risk. In order to know if a plaintiff assumed the risk of a

13  particular activity, the court must determine if the defendant owed

14  a duty to the plaintiff. <u>Knight</u>, 3 Cal. 4th at 313. The existence

15  and scope of a defendant's duty of care is a legal question to be

16  decided by the court rather than by the jury. <u>Id.</u> In the sports

17  context, the determination of the existence of a defendant's duty

18  of care and the scope thereof is a "legal question which depends

19  on the nature of the sport or activity in question and on the

20  parties' general relationship to the activity." <u>Id.</u>

21     The <u>Knight</u> court held that some dangers are inherent and

22  integral to participation in the sport itself and that the court

23  must take these integral dangers into account when determining

24  whether there is a duty of care.

25  ////

26  ////

1

> As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant.

Knight, 3 Cal. 4th at 315 (internal citations omitted). As such, a defendant owes no duty to eliminate or protect plaintiffs from the risk of those harms arising from the inherent dangers of the sport. Id. The doctrine of assumption of risk operates as a complete bar to a plaintiff's recovery. Id.

California courts have contrasted such inherent dangers with those that are clearly not inherent in the sport, such as dangers posed by a ski resort's negligence. Knight, 3 Cal. 4th at 315-16. "[D]efendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." Id. "[W]hen the plaintiff claims the defendant's conduct increased the inherent risk of a sport, summary judgment on primary assumption of risk grounds is unavailable unless the defendant disproves the theory or establishes a lack of causation." Luna v. Vela, 169 Cal. App. 4th 102, 112 (2008) (quoting Huff v. Wilkins, 138 Cal. App. 4th 732, 740 (2006)).

The relationship between the parties is another key factor in determining whether or not a defendant owes a duty to the plaintiff for the dangers encountered in a sport. A defendant who "is an organizer of the activity or someone who has provided or maintained

17

1  the facilities and equipment used" will have a duty to sports

2  participants to not increase the inherent dangers of a sport. Luna,

3  169 Cal. App. 4th at 109 (2008) (citing Morgan v. Fuji Country USA,

4  Inc., 34 Cal. App. 4th 127 (1995)).[3]

5  The California courts have identified the inherent risks in

6  the sport of snow skiing and snowboarding.

7  The risks inherent in snow skiing have been well
   catalogued and recognized by the courts. Those risks
8  include injuries from variations in terrain, surface or
   subsurface snow or ice conditions, moguls, bare spots,
9  rocks, trees, and other forms of natural growth or
   debris. They also include collisions with other skiers,
10 ski lift towers, and other properly marked or plainly
   visible objects and equipment. As a downhill snow sport,
11 snowboarding shares these same risks.

12 Lackner v. North, 135 Cal. App. 4th 1188, 1202 (2006). Here,

13 defendant contends that the traverse where the accident took place

14 is a natural feature in a ski resort and, therefore, defendants did

15 not owe plaintiff a duty of care. Def. Mot. for Sum. J. at 16.

16 Preliminarily, the traverse and alleged conditions of the area

17 where the accident took place would qualify as "variations in

18 terrain" and "surface or subsurface snow or ice conditions" that

19 are natural risks inherent when snowboarding. Furthermore,

20 defendants' maintenance of the traverse is also considered an

21 inherent feature of skiing that a snowboarder would expect to

22 encounter. Connelly v. Mammoth Mountain Ski Area, 39 Cal. App. 4th

23

24      [3]In contrast, no such duty exists among co-participants of a
   sport. Kahn v. East Side Union High School Dist., 31 Cal. 4th 990,
25 1003 (2003) (a baseball stadium owner may owe a duty to spectators
   in the stands to use a certain glass shield to protect against
26 errant balls whereas a pitcher would not owe such a duty).

18

8, 12 (1995). As the California courts have held, slipping, falling down and sliding into rocks and changes in terrain are inherent risks of skiing and that the resort has no duty to eliminate or mitigate these inherent risks. See id.; Lackner, 135 Cal. App. 4th at 1202.

In their opposition to defendants' motion, however, plaintiffs assert that by their misfeasance, defendants assumed a duty of care to Gregorie. See Knight, 3 Cal. 4th at 315-316. A defendant who "is an organizer of the activity or someone who has provided or maintained the facilities and equipment used" also will have a duty to sports participants to not increase the inherent dangers of a sport. Luna, 169 Cal. App. 4th at 109 (citing Morgan v. Fuji Country USA, Inc., 34 Cal. App. 4th 127 (1995)). Plaintiffs assert that defendants increased the risks associated with skiing through their unsafe design of the lifts and traverse and their promoting of use of the traverse in order to reach "Adventure Zones." Plaintiffs further contend that defendants' design of the traverse was not conducive to use by snowboarders, who must remove their snowboard and walk on slippery conditions in snowboard boots with limited purchase. Finally, plaintiffs assert that defendants negligently designed the traverse by directing patrons to utilize a path that was out of bounds and above a hidden cliff. The court considers each of these arguments in turn.

As a threshold matter, because assumption of risk is an affirmative defense for which defendant would bear the burden at trial, defendant must show that no reasonable fact finder could

find in plaintiffs' favor on the issue. <u>Clark v. Capital Credit &</u>
<u>Collection Services, Inc.</u>, 460 F.3d 1162, 1177 (9th Cir. 2006).
Where, as here, the defendant has met its prima facie burden to
show an absence of a genuine issue of material fact on its
affirmative defense, the burden then shifts to the nonmovant to set
forth specific facts that would not entitle the defendant to a
directed verdict on the affirmative defense. <u>Houghton v. South</u>, 965
F.2d 1532, 1536-37 (9th Cir. 1992). The court therefore considers
whether plaintiffs have met this burden in asserting that Alpine,
through its misfeasance, assumed a duty of care to the decedent.

First, the court cannot agree that defendants' advertisement
of the traverse increased the risk associated with skiing.
Plaintiffs argue that defendants should not have advertised the
area when they knew the area was particularly dangerous to
snowboarders. Pls.' Opp'n to Defs.' Mot. For Summ. J. at 22.
Because of her direct experience with it, decedent was aware that
the traverse was designated for advanced skiers. Simply put, it
is undisputed that Gregorie was an experienced snowboarder and had
utilized the Summit Six chairlift at least once that day. <u>See</u> Pls.'
Reply to Defs.' Supplemental Statement of Disputed and Undisputed
Material Facts in support of Opp. to Defs.' Mot for Summ. J. ¶ 6.
Under these circumstances, plaintiffs' argument constitutes an
assertion that would forbid snowboarding.

Even if she did not know of the advanced nature of the
traverse and the surrounding ski runs, the warning signs posted by
defendants at the Summit Six chairlift were sufficient to notify

Gregorie of the risks in that area. When determining whether the notice of a hazard was adequate, California courts have considered the location of the notice, from what distance it was visible, and the size of the notice. See e.g. Van Dyke v. S.K.I. Ltd., 77 Cal. App. 4th 1310, 1314 (1998); Connelly v. Mammoth Mountain Ski Area, 39 Cal. App. 4th 8, 13 (1995). Here, defendants' placement of a large warning sign at the entrance to the ski lift before patrons rode the lift was sufficient notice of the hazards of the traverse. The signs clearly notified patrons of the risks by stating that "A Fall Could Result With an Uncontrollable Slide" and that there was a risk of injury and death. Another sign clarified for riders that the Summit Six Lift was "NOT a beginner lift." See Pls.' Reply to Defs.' Supplemental Statement of Disputed and Undisputed Material Facts in Support of Opp. to Defs.' Mot for Summ. J. ¶¶ 7-8.  As an experienced snowboarder, Gregorie "could expect to encounter more hazards" on an advanced run. O'Donoghue, 30 Cal. App. 4th at  193. While operators of resorts have a duty to warn their patrons of dangerous conditions they are aware of, "the operator of a ski resort is not an insurer of its patron's safety and has no duty to prevent or protect a skier from the inherent risks of the sport." Lackner v. North, 135 Cal. App. 4th 1188, 1202-1203 (2006). Here, defendants sufficiently warned patrons of the risks inherent on the traverse and they did not have a duty to stop Gregorie from encountering those risks once she was aware of them. Plaintiffs' argument that defendants increased the risk by promoting the advanced ski area is unconvincing given the evidence that

21

1  sufficient warnings were in place to deter unqualified skiers and
2  snowboarders from using the area.

3      Second, plaintiffs' argument that defendants increased the
4  risk of the sport through the design of the traverse is also
5  unpersuasive. Plaintiffs have submitted no evidence that the
6  traverse could be designed in a way that would avoid increased risk
7  to snowboarders without completely eliminating the sport of double-
8  black diamond skiing. "Were operators of ski resorts required to
9  entirely eliminate the danger of falling in difficult terrain, the
10 prospect of liability would effectively terminate the business of
11 ski resort operation." Kane v. National Ski Patrol System, Inc.,
12 88 Cal. App. 4th 204, 214 (2001). As stated previously, traverse
13 areas are commonly used to link chair lifts. It is undisputed here
14 that warning signs indicated that the lift was leading into an
15 advanced area where skiers could anticipate more hazardous
16 conditions. Plaintiffs have tendered no evidence that there is an
17 alternative design that would limit the hazards and at the same
18 time maintained the advanced nature of the sport.

19     Next, plaintiffs argue that defendants had a duty to warn
20 patrons of the existence of the cliff below the traverse. It is not
21 disputed that the juniper tree marked with a sign that purported
22 to mark the boundary, which Gregorie slid past, was located before
23 the cliff. See Defs.' Reply to Pls.' Statement of Material Facts
24 in Opp'n to Defs.' Mot. For Summ. J. ¶ 22. Both Gaffey and Gale
25 indicated in their depositions that an experienced skier, like the
26 decedent, would recognize that areas beyond the posted ski area

boundary may contain unmarked hazards and cliffs. See Penwarden
Decl. Ex. R (Gale Depo. at 262:22-263:2); Honowitz Decl. Ex. BB
(Gaffney Depo. at 392:24-396:16). Furthermore, advanced skiers such
as the decedent should be aware that slope change, such as the
cliff, are a part of skiing. See Solis v. Kirkwood Resort Co., 94
Cal. App. 4th 354, 365 (2002). While some California courts have
held that a defendant may have assumed a heightened duty of care
to the plaintiff if the hazard was not "obvious and necessary,"
these cases only address hazards within ski boundaries. Connelly,
39 Cal. App. 4th at 12. The plaintiffs have directed the court to
no authority, and the court has discovered none, that would require
a ski resort to warn of natural hazards outside the ski area
boundaries.

Finally, plaintiffs argue that the decedent did not assume the
risk of snowboarding on the traverse because the actual location
of the boundary was unclear. As stated previously, when determining
the adequacy of a notice, courts have considered the location,
visibility, and size of the notice. See e.g. Van Dyke, 77 Cal. App.
4th at 1314; Connelly, 39 Cal. App. 4th at 13. Defendants tender
evidence that the ski boundary was marked by fifteen to twenty
orange and black signs along the downhill side (hiker's left) to
the west of the traverse. This evidence is undisputed by
plaintiffs. See Pls.' Response to Defs.' Supplemental Separate
Statement by Def. ¶ 24. Furthermore, it is uncontested that
Gregorie slid past a boundary sign located on the juniper tree. The
juniper tree boundary sign was located in view of the traverse and

below where Gregorie was standing, sufficiently warning her of the
marked boundary. Given that a  resort operator has no duty "to mark
every tree, bump, and terrain feature on the mountain," Solis, 94
Cal. App. 4th at 366, the warning signs was sufficient to notify
Gregorie of the ski-boundary.

There is conflicting evidence regarding whether defendants
marked the correct ski boundary. Defendants have tendered evidence
that the boundary line was at the tree line. See Penwarden Decl.
Ex. Q (Depo. of Larry Heywood) at 59:5-25, 73:2-74:25. Defendants
have also argued that the actual ski boundary is unimportant
because the entire traverse, including where Gregorie fell, was
treated and groomed as if it were in-bounds. Goldstone Decl. ¶ 7.
In response, plaintiffs have tendered evidence that the actual ski
boundary was located east of where the decedent fell, placing her
out-of-bounds of the ski area when she fell. Martin Decl. ¶¶ 11-13,
Ex. D; Honowitz Decl. Ex. LL (Depo. of Jason Hill) at 16:3-17, Ex.
KK (Depo. of Billy Martin) at 195:16-196:21. Plaintiffs' evidence
indicates that Gregorie walked along portions of the traverse which
were out-of-bounds, but that she believed she was in-bounds because
of defendants' inaccurate placement of the boundary signs.
Plaintiffs also tendered evidence that Gregorie and Gaffney never
intended to go out-of-bounds. Honowitz Decl. Exhibit BB (Gaffney
Depo. at 395:5-396:16). Finally, plaintiffs have tendered some
evidence that the traverse where the decedent fell was not
typically groomed at the location at which Gregorie was using it
at the time of her fall. Honowitz Decl. Ex. FF (Depo. of Matt

1  Janney at 176:1-10).

2       The problem with plaintiffs' evidence is that even if
3  defendants did not accurately mark the ski boundary and they failed
4  to adequately maintain the area that was out of bounds, these
5  actions seem not to have not increased the risk of the sport.
6  Plaintiffs do not materially object to Gale's testimony, which
7  shows that risks posed by surface conditions and falling are
8  inherent in the sport of snowboarding. Gale further testified that
9  sliding downhill and impacting objects below are inherent risks of
10 snowboarding. See Pls.' Reply to Defs.' Supplemental Statement of
11 Disputed and Undisputed Material Facts in Support of Opp. to Defs.'
12 Mot for Summ. J. ¶¶ 29-32. It thus appears that the location of the
13 boundary in this case is immaterial because, whether Gregorie fell
14 within or outside of the boundary, sliding beyond the boundary and
15 impacting objects is an inherent risk of snowboarding.[4] Moreover,
16 to the extent that the plaintiffs have tendered sufficient evidence
17 from which a jury could find that the defendants increased the risk
18 to Gregorie by failing to properly mark the boundary or maintain
19 the traverse, liability is precluded by virtue of the decedent's
20 express assumption of risk, discussed below.

21 ────────────

22      [4] Defendants rely on Kane v. National Ski Patrol System, Inc.
   (2001), 88 Cal. App. 4th 204, where the decedent slid into an
23 adjacent canyon after skiing on difficult terrain. That case is not
   particularly helpful to the resolution of the issue. The boundary
24 issue, or any mention of whether the decedent crossed the ski
   boundary, is not mentioned in that case. The court held that
25 plaintiff's action was barred by the doctrine of assumption of risk
   because sliding into the canyon was within the range of possible
26 risks involved in the sport.

**C.    The Waiver**

In addition to their assertion that Gregorie primarily assumed the risks of snowboarding, defendants also contend that in the waiver that she signed as part of the season pass contract, Gregorie expressly assumed the risks that led to her death. Plaintiffs, in their complaint, allege that the waiver should be rescinded or is unenforceable due to defendants' breach of contract. Additionally, they argue that, even if it is enforceable, it does not bar their claims. The court considers each of these arguments in turn.

**1.    Rescission (Plaintiffs' Sixth and Eighth Causes of Action) and Breach of Contract (Plaintiffs' Fifth Cause of Action)**

Plaintiffs' sixth and eighth causes of action allege that the waiver contained in the season pass contract must be rescinded under California law. They allege that the season pass contract entered between Gregorie and Alpine Meadows occurred upon defendants' false representation and concealment of various material facts from Gregorie, including that one can only access the Beaver Bowl by passing through an out-of-bounds area, the High Beaver Traverse posed an unreasonable risk of harm to snowboarders and also presented hazardous conditions, which made using it as difficult as hiking through backcountry terrain. Compl. ¶ 131. According to plaintiffs, Gregorie justifiably relied on these misrepresentations when agreeing to the season pass contract, which included the waiver. Plaintiffs' sixth cause

26

of action appears premised solely on a theory of fraud in the inducement, while their eighth cause of action is based on the same factual allegations, but also claims rescission is proper for "fraud, negligent misrepresentation, mistake of fact, material breach of contract and/or failure of consideration." Compl. ¶ 141.

In plaintiffs' fifth cause of action, they allege that defendants breached its duty to provide Gregorie with accurate "information about the terrain (that the Traverse was 'Out of Bounds') [and] the condition of the Traverse" and to protect her from "dangerous conditions in a timely and reasonable manner." Compl. ¶ 128. They allege that these obligations were implied in the terms of the season pass contract through industry custom and practice.

In their opposition to defendants' motion, plaintiffs clarify that their causes of action for rescission and breach of contract are premised on the assertion that Alpine Meadows failed to accurately mark its ski area boundary. This, they argue, constituted fraud in the inducement or alternatively a breach of defendants' obligations under the season pass contract.

**a.   Rescission**

Under California law, a contract may be rescinded if the consent of one of the parties was obtained through fraud. Cal. Civ. Code § 1689(b). Fraud includes assertion or suggestion of a false fact or "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are

27

1   likely to mislead for want of communication of that fact." <u>Id.</u>
2   § 1710(3). It is this latter ground of fraudulent concealment
3   that plaintiffs assert is the basis of rescission here. Pls.'
4   Opp. to Defs.' Mot. for Summ. J. at 28. In order to show that
5   rescission is warranted for fraudulent concealment, plaintiffs
6   must show that (1) defendant concealed or suppressed a material
7   fact, (2) the defendant was under a duty to disclose the fact to
8   the other party, (3) the defendant concealed or suppressed the
9   fact with the intent to defraud, (4) the other party was unaware
10  of the fact and would not have entered into the contract had he
11  known of the fact, and (5) as a result of the concealment, the
12  innocent party sustained damage. <u>Marketing West, Inc. v. Sanyo</u>
13  <u>Fisher (USA) Corp.</u>, 6 Cal. App. 4th 603, 612-13 (1992).

14      Defendants contend that plaintiffs are unable to adduce
15  evidence from which a jury could reasonably find that the
16  elements of intentional deceit, materiality, reliance, or
17  causation. In support of their claim and in opposition to
18  defendants' motion, plaintiffs assert that defendants represented
19  "to its customers" that the ski area boundary was properly marked
20  and that it intended to provide a safe skiing environment through
21  proper signage. They contend that these representations were
22  false and it was reasonable to expect that Gregorie relied on
23  them.

24      There are several reasons why plaintiffs have failed to meet
25  their burden to oppose defendants' motion for summary judgment.
26  Even if a factfinder credits that Alpine Meadows' boundary policy

28

1  was provided to Gregorie, see PSSUF 23 & 41, so as to implicate

2  § 1710's fraud for incomplete statements, plaintiffs have

3  directed the court to no evidence addressing several of the other

4  elements for a claim for rescission based on fraudulent

5  concealment.

6      First, they have tendered no evidence of actual reliance,

7  but only that it was "reasonable for patrons like [Gregorie] to

8  rely on [defendant's] misrepresentations." Pls.' Opp. to Defs.'

9  Mot. at 27. Under California law, actual reliance must be shown,

10 with narrow exceptions that do not apply here. See Mirkin v.

11 Wasserman, 5 Cal. 4th 1082, 1093-94 (1993) (holding that in a

12 class action, plaintiffs need only plead and prove actual

13 reliance for the named plaintiffs and, if done, actual reliance

14 will be presumed for the rest of the class). Moreover, the

15 plaintiffs must prove that the omission or misrepresentation

16 "came to [Gregorie's] attention." Id. at 1095. Here, plaintiffs

17 have only tendered evidence that the Boundary Policy was "made

18 available" to customers when purchasing season passes. See Pls.'

19 Statement of Material Facts No. 23 (citing Honowitz Decl. Ex. EE

20 (Depo. of Scott Swietanski) at 88:21-90:1, Ex. GG (Depo. of Jeff

21 Goldstone) at 172:9-173:1). Plaintiffs have thus tendered no

22 evidence from which a factfinder could reasonably conclude that

23 Gregorie actually relied on the defendants' boundary policy.

24     There is similarly no evidence of intent to deceive.

25 Plaintiffs' own evidence is that defendants did not intend to

26 deceive patrons as to the location of the ski area boundary, but

they themselves were mistaken as to the location. <u>See</u> Pls.'
Statement of Material Facts No. 42.; <u>see also</u> Honowitz Decl. Ex.
II (Depo. of Larry Heywood) at 81:8-84:21 (testifying that he
understood the tree line to mark the ski area boundary).

Accordingly, defendants' motion must be granted as to
plaintiffs' sixth and eighth causes of action for rescission, as
plaintiffs have failed to show that there are adequate facts from
which a jury could find in their favor on essential elements of
these causes of action. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S.
at  322.

### b.   **Breach of Contract**

In their fifth cause of action, plaintiffs allege defendant
breached the terms of the season pass agreement, thus relieving
Gregorie of her obligations under it. Specifically, plaintiffs
allege that defendants breached the season pass agreement because
the agreement, by referring to the ski area boundaries, implies
that the boundaries are properly marked.

Under California law, a cause of action for breach of
contract includes four elements: that a contract exists between
the parties, that the plaintiff performed the contractual duties
or was excused from nonperformance, that the defendant breached
those contractual duties, and that plaintiff's damages were a
result of the breach. <u>Reichert v. General Ins. Co.</u>, 68 Cal. 2d
822, 830 (1968); <u>First Commercial Mortgage Co. v. Reece</u>, 89 Cal.
App. 4th 731, 745 (2001). "If contractual language is clear and
explicit, it governs." <u>Bank of the West v. Superior Court</u>, 2 Cal.

4th 1254, 1264 (1992). Contracts should be interpreted by their plain language, unless doing so would result in an absurd construction. Cal. Civ. Code § 1638. The entire contract should be read together as a whole, giving effect to every part. Id. § 1641. When a contract has been reduced to writing, the intent of the parties should be ascertained by the writing alone. Id. § 1639.

The relevant language of the ski pass contract is contained in the waiver portion, which provided,

> If I ski or snowboard beyond the ski area boundary, I agree to assume all risks inherent in backcountry skiing and snowboarding. . . . I AGREE TO EXPRESSLY ASSUME ANY AND ALL RISK OF INJURY OR DEATH which might be associated with my participation in the sport of skiing and snowboarding and use of the facilities of Alpine Meadows, including . . . skiing or snowboarding beyond the ski area boundary . . . .

Compl. Ex. A. As discussed above, the defendants' failure to properly mark the boundary might lead a factfinder to conclude that Gregorie did not primarily assume the risk of walking past the boundary. However, there is nothing in the language of the agreement itself that implies that defendant has assumed a duty, which was integrated into the contract, to mark the boundaries or to mark them properly. Under California law, the court cannot read ambiguity into a contract where there is none or insert terms into a contract not obviously contemplated by the parties. See Ticor Title Ins. Co. v. Employers Ins. of Wasau, 40 Cal. App. 4th 1699, 1707 (1995) ("Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent

from the written terms and go no further."). Because, as a matter of law, the contract is not ambiguous and does not contain the term that plaintiffs allege was breached, summary judgment must be granted in defendants' favor as to plaintiffs' fifth cause of action.

### 2.   The Effect of the Waiver

As an affirmative defense to plaintiffs' first, second, third, fourth, and seventh causes of action, defendants assert that Gregorie expressly assumed the risks of the condition of the premises and the defendants' negligence in the waiver. The plaintiffs dispute this on various grounds.

Preliminarily, the waiver and release purports to release Alpine from any cause of action for wrongful death, however decedent did not have the ability to waive a cause of action on behalf of her heirs. "The longstanding rule is that wrongful death action is a separate and distinct right belonging to the heirs, and it does not arise until the death of the decedent." Madison v. Superior Court, 203 Cal. App. 3d 589, 596 (1988). Nevertheless, "[i]n a wrongful death action [the plaintiff] is subject to any defenses which could have been asserted against the decedent, including an express agreement by the decedent to waive the defendant's negligence and assume all risks." Id. at 597. Therefore, although an express waiver of liability is legally ineffective to release a wrongful death cause of action, a release may provide a defendant with a complete defense to all claims, including wrongful death actions. Id. at 597.

1    Through an express waiver of liability, a releasor promises

2    not to sue the releasee for future harm as a result of the

3    latter's misconduct or negligence. Specifically, the releasor

4    eliminates the releasee's duty of care and consents to the

5    possible negligent misconduct by expressly agreeing not to expect

6    the releasee to act carefully. Coates v. Newhall Land & Farming,

7    191 Cal. App. 3d 1, 8 (1987). "Both agreements permit behavior

8    that normally would be actionable as tortious, although an

9    express assumption of risk goes further, more clearly authorizing

10   this behavior." Id.

> A decedent's preinjury contractual assumption of risk
> eliminates the possibility of tortious conduct by a
> potential defendant, and thus precludes a wrongful death
> action, if (1) the contract is not against public policy
> and (2) the risk encountered by the decedent is inherent in
> the activity in which the decedent was engaged, or the type
> of risk the parties contemplated when they executed the
> contract.

16   Id. at 4. Thus, if the decedent relieved Alpine of any legal duty

17   to her, Alpine can not be liable for negligence in either a

18   wrongful death or survivorship suit.

19           **i.   The Waiver Was Not Contrary to Public Policy**

20   The California Supreme Court has held that in order for an

21   express assumption of risk to relieve a defendant of a legal duty

22   to a plaintiff, the agreement may not violate public policy.

23   Knight v. Jewett, 3 Cal. 4th 296, 308, n. 4 (1992). "No public

24   policy opposes private, voluntary transactions in which one

25   party, for a consideration, agrees to shoulder a risk which the

26   law would otherwise have placed upon the other party. . . ."

Tunkl v. Regents of Univ. of Cal., 60 Cal. 2d 92, 101 (1963). A

waiver or release that is invalid for public policy reasons

typically has the following characteristics:

> It concerns a business of a type generally thought
> suitable for public regulation. The party seeking
> exculpation is engaged in performing a service of
> great importance to the public, which is often a
> matter of practical necessity for some members of the
> public.  The party holds himself out as willing to
> perform this service for any member of the public
> who seeks it, or at least for any member coming within
> certain established standards. As a result of the
> essential nature of the service, in the economic
> setting of the transaction, the party invoking
> exculpation possesses a decisive advantage of
> bargaining strength against any member of the public
> who seeks his services. In exercising a superior
> bargaining power the party confronts the public with
> a standardized adhesion contract of exculpation, and
> makes no provision whereby a purchaser may pay
> additional reasonable fees and obtain protection
> against negligence. Finally, as a result of the
> transaction, the person or property of the purchaser
> is placed under the control of the seller, subject to
> the risk of carelessness by the seller or his agents.

Id. at 98-101.

Applying this principle, "[e]xculpatory agreements in the

recreational sports context do not implicate the public

interest." Allan v. Snow Summit, 51 Cal. App. 4th 1358, 1374

(1996); see also Platzer v. Mammoth Mountain Ski Area, 104 Cal.

App. 4th 1253, 1258 (2002) ("California courts have consistently

declined to apply Tunkl and invalidate exculpatory agreements in

the recreational sports context."). "Skiing, like other athletic

or recreational pursuits, however beneficial, is not an essential

activity." Olsen v. Breeze, Inc., 48 Cal. App. 4th 608, 622

(1996). "A release of all premises liability in consideration for

permission to enter recreational and social facilities for any purpose does not violate public policy." Benedek v. PLC Santa Monica, 104 Cal. App. 4th 1351, 1359 (2002).

Courts have generously applied this limitation. For example, in Platzer, the plaintiff signed an express release for her eight year old child, releasing the defendant, a ski resort, from liability. The child fell from a ski lift, but despite chairlift operations fitting the statutory definition of a common carrier, the court concluded that public policy was not implicated and that the release was effective. Platzer, 104 Cal. App. 4th at 1260.

The same result is compelled here. Although Alpine's chairlift operation may meet the definition of a common carrier in Section 2168 of the California Civil Code, the accident did not take place in conjunction with the chairlift. Thus public policy is even less likely to be implicated in this case then in Platzer.

An exception to this rule exists, however, where the defendant violated a statute, committed fraud, or intentionally injured the plaintiff. In such cases, even if the defendant is a recreational sports provider or site, an express assumption of risk cannot allow the defendant to avoid liability for these acts. Capri v. L.A. Fitness Int'l, LLC, 136 Cal. App. 4th 1078, 1084 (2006)(citing Tunkl, 60 Cal.2d at 96). This exception derives from California Civil Code § 1668, which provides

> All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

Further, "under section 1668, 'a party [cannot] contract away liability for his fraudulent or intentional acts or for his negligent violations of statutory law,' regardless of whether the public interest is affected." Health Net of California, Inc. v. Department of Health Services, 113 Cal. App. 4th 224, 233 (2003)(quoting Gardner v. Downtown Porsche Audi, 180 Cal. App. 3d 713, 716 (1986)).

In Capri, the appellant joined a health club and signed a membership agreement, which contained a release and waiver of liability. Capri, 136 Cal. App. 4th at 1081. The appellant slipped and fell at a health club due to algae buildup on a pool deck and brought a claim for negligence and negligence per se. Id. at 1082. The appellant argued that the release and waiver of liability was invalid under section 1668 as it attempted to relieve the club of liability for violating a section of the Health and Safety Code that required public pool operators to implement "measures to insure safety of bathers . . . ." Id. at 1083. The trial court's decision to grant summary judgment was reversed by the court of appeal because the release and waiver was "squarely within the explicit prohibition in section 1668 against contractual exculpation for a 'violation of law' and [was] invalid." Id.

36

at 1085; see also Hanna v. Lederman, 223 Cal. App. 2d 786 (1963) (wavier in a lease did not bar tenants' claims against landlord for violations of municipal codes that required alarms in the fire sprinkler system); Health Net, 113 Cal. App. 4th at 235 (the court of appeal reversed an order for summery judgment by a trial court based on an exculpatory clause because the exculpatory clause was invalid under section 1668 as it purported to exculpate the agency from liability for statutory violations).

Here, the plaintiff contends that the waiver and release is unenforceable under § 1668, asserting that defendants violated 16 U.S.C. § 497b(a) and 36 C.F.R. 251.50-251.64. This statute and group of regulations govern Special Use Permits granted by the United States Forest Service. It is undisputed that defendant Alpine operates the ski resort on both federal and private land and therefore must abide by the National Forest Ski Area Act ("FSAA"). The FSAA allows for operation of ski areas and facilities on National Forest System land through a special use permit ("SUP"). 16 U.S.C. § 497b(a); see also 36 C.F.R. 251.53(n). A SUP "holder is authorized only to occupy such land and structures and conduct such activities as is specified in the special use authorization." 36 C.F.R. 251.55(a).

Plaintiff asserts that Alpine designated the ski area boundary near the traverse outside of the area permitted by the SUP. This area is designated as Section 7 on the use

37

permit. However, it is undisputed that Section 7 is private

land, not Forest Service land. <u>See</u> Pls.' Response to Defs.'

Supp. Sep. Statement of Material Facts No. 21; Pls.' Statement

of Material Facts In Support of Opp. to Defs.' Mot. for Summ.

J. No. 49. Thus, even if the ski resort boundary within

Section 7 was mismarked, as plaintiffs contend, this would not

appear to implicate the FSAA, as the areas outside of this

boundary in Section 7 were held in fee simple and were not

Forest Service land. <u>See</u> <u>id.</u> The plaintiffs, therefore, have

not tendered any evidence from which a jury could reasonably

conclude that California Civil Code § 1668 applies.[5]

Consequently, the waiver is not unenforceable as violative of

public policy.

### ii. The Express Assumption of Risk Is Effective

Contract principles apply when interpreting an express

assumption of risk. <u>Cohen v. Five Brooks Stable</u>, 159 Cal. App.

4th 1476, 1483 (2008).

> In its most basic sense, assumption of risk means
> that the plaintiff, in advance, has given his
> express consent to relieve the defendant of an
> obligation of conduct toward him, and to take his
> chances of injury from a known risk arising from
> what the defendant is to do or leave undone . . .
> The result is that the defendant is relieved of
> legal duty to the plaintiff; and being under no
> duty, he cannot be charged with negligence.

---

[5]The plaintiffs' citation to <u>United States v. Johnson</u>, 988 F.
Supp. 920, 923 (W.D.N.C. 1997), is not helpful. That case simply
held that a violation of 36 C.F.R. 251.55(a) is a strict liability
offense. As described above, the undisputed facts indicate that
defendants did not violate this regulation in their marking of the
ski resort boundary in Section 7.

1  <u>Madison</u>, 203 Cal. App. 3d at 597. Typically the meaning of the

2  language in the release is a question of law.  <u>Solis v.</u>

3  <u>Kirkwood Resort Co.</u>, 94 Cal. App. 4th 354, 360 (2001); <u>see</u>

4  <u>also</u> <u>Paralift, Inc. v. Superior Court</u>, 23 Cal. App. 4th 748,

5  754 (1993) (When no conflicting parol evidence is introduced

6  concerning the interpretation of a liability release document,

7  "construction of the instrument is a question of law, and the

8  appellate court will independently construe the writing.").

9  Thus the court must determine whether the release in this case

10 has effectively negated the duty element of plaintiffs' causes

11 of action.  <u>Allabach v. Santa Clara County Fair Ass'n</u>, 46 Cal.

12 App. 4th 1007 (1996). Standards which a release must meet have

13 been well established by the California courts.

14      To be effective, "a release need not achieve perfection."

15 <u>Nat'l & Int'l Brotherhood of St. Racers, Inc. v. Superior</u>

16 <u>Court</u>, 215 Cal. App. 3d 934, 938 (1989). "As long as the

17 release constitutes a clear and unequivocal waiver with

18 specific reference to a defendant's negligence, it will be

19 sufficient."  <u>Madison</u>, 203 Cal. App. 3d at 597. However, use

20 of the word "negligence" or any particular verbiage is not

21 required; rather the waiver must inform the releasor that it

22 applies to misconduct on the part of the releasee. <u>Cohen</u>, 159

23 Cal. App. 4th at 1489.

24      Courts typically find the following types of express

25 release valid: (1) a release which serves to makes clear to a

26 layperson that the releasor will release any claim against the

39

1  releasee for negligence or (2) a release stating that the
2  releasor cannot hold the releasee liable for any risks that
3  arise form the releasee's premises or facilities. Cohen, 159
4  Cal. App. 4th at 1491; compare Madison, 203 Cal. App. 3d at
5  594 (where the release expressly stated that the decedent
6  voluntarily releases, discharges, waives and relinquishes all
7  actions or causes of action including negligence), with
8  Benedek, 104 Cal. App. 4th at 1358 (where the releasor
9  released a gym from liability for personal injuries suffered
10 while on the premises, "whether using exercise equipment or
11 not"), and Sanchez v. Bally's Total Fitness Corp., 68 Cal.
12 App. 4th 62, 65 (1998) (where releasor agreed that the fitness
13 center is not liable for any injuries or damages arising out
14 of or connected with the use of the fitness center).

15     California courts require a release to be clear and
16 specific to find that a releasee has been relieved from
17 liability for negligence. Cohen, 159 Cal. App. 4th at 1488. To
18 be valid and enforceable, a written release exculpating a
19 tortfeasor from liability must be clear, unambiguous and
20 explicit in expressing the parties' intent. Ferrell v. S. Nev.
21 Off-Road Enthusiasts, Ltd., 147 Cal. App. 3d 309, 314-18
22 (1983). "To decide if the release is enforceable . . . we
23 should inquire whether its enforcement would defeat the
24 reasonable expectations of the parties to the contract."
25 Paralift, 23 Cal. App. 4th at 756. "An ambiguity exists when a
26 party can identify an alternative, semantically reasonable,

1  candidate of meaning of a writing." Solis, 94 Cal. App. 4th

2  at 360. "If an ambiguity as to the scope of the release

3  exists, it should normally be construed against the drafter."

4  Benedek, 104 Cal. App. 4th at 1357.

5      In Cohen, the court held that release for horseback

6  riding was unenforceable because it did not meet either of the

7  above standards. Cohen, 159 Cal. App. 4th at 1489. The word

8  "negligence" was used once but referred to the releasor

9  negligence and not to the releasee. The release stated that

10  the releasor "assume[s] full responsibility for myself, . . .

11  for bodily injury, death and loss of personal property and

12  expenses thereof as a result of those inherent risks and

13  dangers and of my negligence in participating in this

14  activity." The court held that the release did not "clearly,

15  unambiguously, and explicitly" show that it was applicable to

16  the risk of the releasee's negligence or injuries related to

17  the use of the releasee's facilities. Id.

18      Under California law, the scope of the waiver must be

19  clear, as well. When determining the effectiveness of an

20  express waiver of liability, "the legal issue is not whether

21  the particular risk of injury appellant suffered is inherent

22  in the recreational activity to which the Release applies but

23  simply the scope of the Release." Cohen, 159 Cal. App. 4th at

24  1484. When there has been no extrinsic evidence submitted, the

25  court shall determine the scope of a release by the express

26  language of the release. See Sanchez, 68 Cal. App. 4th at 69.

1    Courts require the express terms of the release to be
2  applicable to the particular negligence or misconduct of the
3  defendant, but every possible act of negligence need not be
4  specifically included in the express waiver. Id. at 68-9.
5  Furthermore, when a waiver expressly releases the defendant
6  from any liability, the plaintiff need not have had specific
7  knowledge of the particular risk or danger that resulted in
8  injury. Paralift, 23 Cal. App. 4th at 757. Rather, "it is only
9  necessary that the act of negligence, which results in injury
10 to the releasor, be reasonably related to the object or
11 purpose for which the release is given." Madison, 203 Cal.
12 App. 3d at 601.  "An act of negligence is reasonably related
13 to the object or purpose for which the release was given if it
14 is included within the express scope of the release." Benedek,
15 104 Cal. App. 4th at 1358.

16    In Cohen, 159 Cal. App. 4th 1472,, the plaintiff was
17 injured while on a horseback riding tour, after the guide
18 caused the lead horse to gallop, leading the other horses on
19 the tour to follow and plaintiff falling from a horse. The
20 court found that the risk of plaintiff's injury was outside of
21 the scope of the release, stating that "[n]othing in the
22 Release clearly, unambiguously, and explicitly indicates that
23 it applies to risks and dangers attributable to respondent's
24 negligence or that of an employee that may not be inherent in
25 supervised recreational trail riding." Id. at 1489 (emphasis
26 omitted); see also Buchan v. U.S. Cycling Federation, 227 Cal.

42

1  App. 3d 134 (1991) (waiver that referred only to "cycling [as]
2  an inherently dangerous sport," was effective against
3  plaintiff's claims related to falling and crashing, as those
4  are risks inherent to the sport).

5       In contrast, in the present case the release signed by
6  Gregorie is a clear and unambiguous express assumption of risk
7  of "any and all risk of injury or death which may be
8  associated with [her] participation in the sports of skiing
9  and snowboarding and the use of the facilities of Alpine,
10 including . . . skiing or snowboarding beyond the ski area
11 boundaries . . . ." See Compl. Ex. A (emphasis omitted).
12 Furthermore, the release serves to release Alpine from
13 liability for negligence. The release states that decedent
14 agreed "to release from liability Alpine Meadows Ski
15 Corporation, Powdr Corp. . . . for any damages, injury, or
16 death to me arising from my participation in the sports of
17 skiing and snowboarding and my use of the facilities at Alpine
18 Meadows regardless of cause, including the alleged negligence
19 of Alpine Meadows." Id. (emphasis omitted). The release serves
20 to make clear to a layperson untrained in the law that the
21 releasor is giving up any future claim for against the
22 releasee for negligence.

23      The release in the present case is clear and specific in
24 releasing Alpine from liability form negligence and any injury
25 resulting from the use its facilities. The purpose of the
26 release was to allow Gregorie to access Alpine's ski and

43

1  snowboarding facilities, including the traverse, and was given

2  as consideration for obtaining a season pass. The release was

3  not ambiguous. The document was clearly titled, and broken

4  into two distinct sections. The first section acknowledged the

5  risk of the sport and assuming the risks. The second section

6  is an agreement not to sue and to release the defendants from

7  liability, including negligence and injuries arising out of

8  the use of Alpine's Facilities. Enforcement of the release

9  would not defeat any reasonable expectations of the parties.

10 The release specifically assumes the risk of injury or death

11 associated with snowboarding beyond the ski boundaries. Even

12 if decedent first slipped when she was out of bounds, the risk

13 of her injury was expressly assumed by her agreement.

14      Even if Alpine was negligent, the release, in contrast

15 with that at issue in Cohen, clearly, unambiguously and

16 expressly covers Alpine's negligence, which would including

17 not closing the traverse or failing to provide adequate

18 warning of the snow conditions. The release is also more

19 specific than the release enforced in Buchan. Here, the

20 release includes specific risks and consequences of skiing and

21 snowboarding, injury and death.  Although not specifically

22 included in the release, it is apparent that a skier or

23 snowboarder while hiking on a steep slope could slip, fall and

24 experience an uncontrollable slide resulting in a collision

25 with a number of natural objects. Slipping, falling, and

26 striking natural objects on a mountain are inherent risks of

44

1  snowboarding, just as colliding with other racers is inherent
2  in cycling. See Buchan, 227 Cal. App. 3d at 148; see also
3  Lackner v. North, 135 Cal. App. 4th 1188, 1202 (2006) (falling
4  and colliding with objects is a risk inherent in skiing). The
5  release made Gregorie aware that skiing and snowboarding at
6  Alpine posed the risk of injury and death. When a releasor has
7  expressly released a defendant from liability for any future
8  act of negligence, "the law imposes no requirement that [the
9  releasor] have had a specific knowledge of the particular risk
10 which resulted in [the death]." Madison, 203 Cal. App. 3d at
11 601.

12     Accordingly, the entire waiver taken as a whole clearly
13 and unambiguously makes clear to a layperson untrained in the
14 law that its effect was to release claims for personal
15 injuries as a result Alpine's negligent acts and for any
16 injuries arising from the uses of the facilities. Therefore
17 the release and waiver of liability are valid and enforceable.
18 Defendants' motion for summary judgment is granted as to the
19 plaintiff's first, second, third, fourth and seventh causes of
20 action.[6]

21                        **IV. CONCLUSION**

22     For the reasons stated herein, the defendants' motion for
23 summary judgment is GRANTED.

24 ─────────────

25     [6]Because the court concludes that summary judgment must be
   granted for defendants on these claims, it need not reach
26 defendants' argument regarding the availability of punitive
   damages.

1     The Clerk is directed to close the case.

2     IT IS SO ORDERED.

3     DATED:  August 6, 2009.

4

5

6                                    _____
                                     LAWRENCE K. KARLTON
7                                    SENIOR JUDGE
                                     UNITED STATES DISTRICT COURT
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26